UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MCLAREN REGIONAL MEDICAL
CENTER,

                        Plaintiff,                              Case Number 16-14268

v.                                                  Honorable David M. Lawson

COMPLETERX, LTD.,

                        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL DISMISSAL

      Plaintiff McLaren Regional Medical Center outsourced its pharmacy services at its hospital located in Flint, Michigan to defendant CompleteRX, Ltd., a Texas company.  The parties entered into a detailed management agreement in which they agreed that CompleteRX would manage the on-site pharmacy at the plaintiff's hospital and McLaren would pay certain charges and reimburse the defendant for certain costs.  McLaren believed that CompleteRX overcharged for its services and then balked when McLaren asked to audit the books.  CompleteRX then filed what might be characterized as a preemptive lawsuit against McLaren in a Texas state court.  McLaren then filed a multi-count complaint in this Court.  CompleteRX countered with a motion for partial dismissal and a motion to stay this case pending the outcome of the Texas litigation.

      The Court heard oral argument on both motions on April 26, 2017 and denied the motion to stay from the bench.  Because neither party filed a copy of the management agreement, the Court ordered them to file supplemental briefs that included that document.  Those additional briefs now have been filed.  The main thrust of McLaren's disagreement with CompleteRX is that it breached the contract by charging too much (and also by suing in Texas in violation of the forum selection

clause).  The amended complaint also plausibly pleads a conversion claim.  However, the counts of

the amended complaint based on breach of an implied covenant of good faith, breach of fiduciary

duty, and fraud must be dismissed.                    I.

        The management agreement was signed on April 1, 2012 and amended at least once.  Under

sections 2.11 and 10.21 of the agreement, CompleteRX acknowledged that its performance under

the agreement would require it to have access to confidential information about the hospital and its

patients, and CompleteRX agreed to keep all of that information confidential, not to disclose it

except as required upon proper authorization, to use the information only for the purpose of

performing its duties under the agreement, and, upon a demand by the hospital, to return or destroy

any copies of such information held by it.

        Under section 2.7 of the agreement, CompleteRX agreed to purchase all drugs prescribed or

to be furnished to patients of the hospital from McLaren's "GPO vendors and programs," so that the

hospital "would receive GPO credit and all GPO rebates for drug purchases."  The hospital agreed

to reimburse CompleteRX for the purchase price of all "Specialty Drugs," which were listed in

section 1.5 of the agreement, plus fees according to a schedule set forth in Exhibit A of the

agreement.  CompleteRX was supposed to bill McLaren semi-monthly for any such fees.  Proof of

the amounts and types of such drugs dispensed was initially to be shown by "utilization reports,"

prepared by McLaren, but under an amendment to the agreement, it was later to be proved by drug

wholesaler invoices and purchase reports.

        For procuring and dispensing all other drugs not listed as "Specialty Drugs," and for all other

products such as medical devices, the parties agreed that CompleteRX would be paid according to

a "Pre-Agreed Cost Formula" set forth in Exhibit A to the agreement.  That formula involved

quantities of patients, "patient days," and "adjusted patient days," and called for payment based on a rate per adjusted patient day multiplied by the number of adjusted patient days in the billing period.

Section 10.9 of the agreement provided that it "only [may] be amended by the mutual written consent of the parties." Am. Compl. ¶ 12. The agreement was altered three times by written amendments executed by the parties, but each of those amendments provided that all terms of the agreement not expressly modified remained in force. *Id.* ¶ 13. It does not appear that any of the amended terms are in dispute here.

Under sections 10.4 and 10.5 of the agreement, CompleteRX was obligated to permit McLaren to review and audit its records of drug purchases and billings to verify that they were done according to the agreement. In March 2016, McLaren conducted an audit with the assistance of an outside accounting contractor that revealed "substantial overcharges" spanning from April 2012 through mid-2016. Among other things, the audit revealed that CompleteRX had inflated charges by (1) charging for drugs dispensed as "Specialty Drugs" that were not listed in section 1.5 of the agreement; (2) charging for medical devices provided as "Specialty Drugs" that were not covered by section 1.5; and (3) changing the billing date for drugs that were "Specialty Drugs" to charge for them when they were purchased, rather than when they were dispensed to patients.

McLaren also alleges that some drugs or medical devices were sold or transferred from the hospital's pharmacy to other medical facilities. According to McLaren, CompleteRX should have recorded any payments received from those sales or transfers as a credit against amounts to be billed to McLaren, but no such credits were applied.

The hospital also alleges that, during the term of the agreement, responsibility for dispensing certain drugs and devices was transferred from the pharmacy to other departments in the hospital, but CompleteRX "continued to charge the full 'Pre-Agreed Cost Formula'" for those items, "instead of adjusting the consideration payable," with the result that it was paid for doing or supplying things that it no longer handled.  Finally, the hospital also contends that CompleteRX billed it for certain "Department Charges" that were not contemplated or allowed under any provision of the agreement.

The hospital asserts that, after the 2016 audit, CompleteRX "admitted overcharging McLaren [by] $169,128.17" in a letter dated May 11, 2016.  However, CompleteRX attempted to create a setoff against the overcharges by conjuring undercharges in certain invoices from April 2012 through December 2014.  CompleteRX was able to generate a payable offset that exceeded its admitted overcharges disclosed by the audit.  To support its position that the hospital had underpaid, CompleteRX allegedly "recategorized" drugs that it previously had billed under the "Pre-Agreed Cost Formula" and claimed that they should have been billed as "Specialty Drugs," according to the cost-plus schedule under Exhibit A.  CompleteRX applied the recategorization both to old billings and to new invoices going forward after the audit.  However, the hospital now believes that CompleteRX actually billed it twice for many of those drugs, once under the old, "Pre-Agreed Cost Formula," and again after the drugs were "recategorized" as "Specialty Drugs."  As part of its recategorization program, the hospital alleges that CompleteRX misrepresented which drugs were Specialty Drugs, submitted "false invoices," and gave McLaren one list enumerating such drugs in March 2016, and another, different list in June 2016, to support its "underbilling" claim.

The hospital also alleges that CompleteRX failed to turn over or offer for inspection all of its books and records relating to the pharmacy, falsely claiming that it could not provide access to

-4-

the records for the auditing contractor because the records contained "confidential information," even though the information withheld largely or completely was derived from information provided to CompleteRX by the hospital itself.  In particular, the hospital alleges that in an August 24, 2016 letter, CompleteRX stated that it no longer would communicate with the outside auditor about its pharmacy operation, despite having earlier consented to the involvement of the auditor in the records review.

The hospital also alleges that on September 8, 2016, CompleteRX breached the agreement's forum selection clause, which designated "Michigan as the forum for all disputes arising under this agreement," by filing a lawsuit against the hospital in a Texas state court, raising claims for breach of contract and various torts.

CompleteRX asserts, in its motion to stay the case, that McLaren terminated the management agreement on July 31, 2016.  However, it represents that the parties subsequently entered into a "post-termination interim agreement" under which CompleteRX agreed to fill in and continue providing drug purchasing and dispensing services until a new pharmacy management contractor could be secured by the hospital.

CompleteRX filed its Texas lawsuit on September 8, 2016, after McLaren refused to pay in full certain invoices submitted under the original management agreement and the interim agreement. It named McLaren and its auditing contractor, Fides Healthcare, LLC., as defendants.  CompleteRX alleged breach of the original and interim agreements, and it also raised claims for tortious interference, defamation, and "business disparagement," based upon allegedly false statements made by McLaren and its auditor to other hospitals about the purported "substantial overcharges" disclosed by the audit.  On September 29, 2016, McLaren filed a motion to dismiss.  The Texas state

court granted the motion in part and dismissed the breach of contract claim without prejudice, based on the forum selection clause in the management agreement. However, it retained the other tort law claims. After its breach of contract claim was dismissed in the state court case, CompleteRX re-filed it as a counter-claim here.

On November 9, 2016, the plaintiff filed its complaint against defendant CompleteRX, Ltd. in the Genesee County, Michigan circuit court. CompleteRX removed the case to this Court and filed a motion to dismiss. The plaintiff followed with a first amended complaint, the defendant subsequently filed a renewed motion to dismiss and an answer to the first amended complaint, with counter-claim. The amended complaint contains the following claims: breach of contract (count I); breach of an implied covenant of good faith (count II); breach of fiduciary duty (count III); conversion (count IV); and fraud (count V). The defendant has moved to dismiss counts II through V.

II.

The defendant's motion is based on Federal Rule of Civil Procedure 12(b)(6). The standards are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550

-6-

U.S. 544, 556, 570 (2007).  Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief.  *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

At this stage of the case, the Court must accept as true the pleaded facts, but not factual conclusions unless they are plausibly supported by the pleaded facts.  "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded.  *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).  However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

When deciding if the plaintiff has satisfied that standard, the Court looks to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, and documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Solerne, N.A.*, 534 U.S. 596 (2002). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

A.

The defendant argues that the claim for "breach of the implied duty of good faith" is defective as a matter of law, because there is no such cause of action under Michigan state law, and because nothing alleged in the complaint suggests that any duty of the defendant under the agreement required it to exercise its discretion. McLaren contends that the claim for breach of the duty of good faith and fair dealing is sufficiently pleaded, because it has alleged that the defendant "made its performance a matter of its own discretion." It argues that this discretionary aspect of the defendant's performance is what gives rise to an enforceable implied duty to proceed in good faith, the neglect of which can support a viable claim for breach of contract. The defendant has the better argument.

"'It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Bank of America, NA v. Fidelity National Title Ins. Co.*, 316 Mich. App. 480, 500-501, 892 N.W.2d 467, 479 (2016) (quoting *Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151-52, 483 N.W.2d 652, 655 (1992)). "'However, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing.'" *Ibid.* (quoting *Fodale v. Waste Mgmt. of Michigan, Inc.*, 271 Mich. App. 11, 35, 718 N.W.2d 827, 841 (2006)). "Moreover, the failure to [abide by certain provisions of a contract] does not constitute a gap to be filled by the implied duty of good faith and fair dealing when the policy is clear and specific regarding the parties' rights and obligations." *Id.* at 501, 892 N.W.2d at 480

There is an exception, however. "Michigan recognizes that an enforceable implied covenant of good faith and fair dealing arises when one party to a contract makes its performance a matter of its own discretion." *Bd. of Trustees of City of Birmingham Employees' Ret. Sys. v. Comerica Bank*, 767 F. Supp. 2d 793, 805 (E.D. Mich. 2011) (citing *Stephenson v. Allstate Ins. Co.,* 328 F.3d 822, 826 (6th Cir. 2003)). In its supplemental brief, McLaren refers to section 5.4 of the pharmacy management agreement to substantiate this claim, because the agreement states that "'CompleteRX will, in its reasonable discretion, immediately and unilaterally adjust the consideration payable by Hospital pursuant to this Agreement,' in certain circumstances." Plf.'s Supp. Br. at 1. However, as the defendant correctly points out, the "certain circumstances" specified in the agreement are narrow and immaterial to the plaintiff's claims. The full sentence that is quoted only in part by the plaintiff reads as follows:

> Hospital acknowledges and agrees that *if any of the information furnished by Hospital to CompleteRX during the Needs Cost Analysis* (all of which is listed below) *was inaccurate, materially untrue or misleading when given*, CompleteRX will, in its reasonable discretion, immediately and unilaterally adjust the consideration payable by Hospital pursuant to this Agreement to take into account the economic impact on CompleteRX of such error (with such adjustment being made prospectively as well as retroactively, if appropriate), and Hospital will be obligated to pay such consideration in full, as adjusted.

Agreement § 5.4 (emphasis added). The amended complaint does not contain any allegations to suggest that the defendant purported to make any adjustments to the agreement based upon allegedly materially inaccurate or misleading information provided by the Hospital. Instead, the facts alleged suggest only that certain drugs which were classified in one way under the agreement, and billed at a higher rate, should have been classified another way, and billed at a lower rate. In other words, the dispute, so far as it is alleged in the amended complaint, involved nothing more than a disagreement over the application or interpretation of the terms of the agreement. No circumstances

alleged in the amended complaint or evident from the text of the agreement suggest that any modification privilege under Section V of the agreement, which concerned the "Hospital's Representations and Warranties," ever was in play.

The plaintiff also contends that other elements of performance, like billing drugs as "Specialty Drugs" or by another formula, were "discretionary" because the agreement was "silent" as to those items. Resolving that claim will not require the Court to contemplate any implied duty, and the plaintiff does not allege that any provision of the agreement itself reposed "discretion" in the defendant as to how items should be classified. *Stephenson*, 328 F.3d at 826-27 ("An implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes its performance a matter of its own discretion. . . . Consequently, when the parties have unmistakably expressed their respective rights . . . the covenant does not adhere." (quotations and citations omitted)). Indeed, the plaintiff's position here that the defendant had "discretion" under the agreement is counter-factual in light of its allegations that specific terms of the agreement defined what items should be billed one way and what items should be billed the other — i.e., that the defendant had no leeway to do one thing, because the agreement dictated that it must do the other. The recently-filed management agreement clarifies that point. The operative provision of the agreement that was submitted states:

> "Specialty Drugs" means those Drugs on the Specialty Drug Listing including thrombolytics, GP-IIB/IIIA inhibitors (including without limitation Reopro, Aggrastat, Integrilin), contrast media, chemotherapy products, hematopoietics, immune products, monoclonal antibodies, blood products, hemostatics, AIDS products, anesthesia gases, Acetadote, Reclast, Neumega, Hemabate, Xigris, Argatroban, Angiomax, Synagis, Natrecor, Aredia, Trasylol, Infasurf, Adenoscan, Regranex, Lupiridium, pharmacy non-patient chargeable items, department charges, and any new Drugs with a wholesale cost per dispensed dose of $50 or more.

-10-

Agreement § 1.5.  On this score, the amended complaint alleges nothing more than a simple breach of the contract, because items billed as "Specialty Drugs" either were on the list (or met the criteria) or they were not.  Some of the terms in this provision may be open to interpretation (by application of all the usual tools of contract construction), but nothing in the agreement states that CompleteRX was vested with sole authority to determine or modify in the first instance the enumeration of "Specialty Drugs," or to alter any of the categorical definitions for what things would be counted as such.  The text of the agreement suggests that the list of Specialty Drugs was an exhaustive catalog of specific items, not merely an open-ended or vague guideline or set of rules for classifying drugs, that would be subject to interpretation or application at the sole discretion of the defendant.

None of the other provisions relating to "Specialty Drugs" suggest that the defendant had sole or open-ended discretion about reporting or billing for them.  Exhibit A to the agreement states that the Hospital "agrees to reimburse CompleteRX for all Specialty Drugs dispensed by the Pharmacy," and that "reimbursements will be based upon the Utilization Reports prepared by [the] Hospital."  A later amendment to the agreement (dated September 1, 2012) modified that paragraph to state that "reimbursements will be based upon actual drug wholesaler purchase reports and manufacturer invoices.  Neither of those additions calls for the exercise of sole discretion by the defendant.

Because the agreement does not purport to vest sole discretion in CompleteRX to determine or modify the criteria for deciding what is a "Specialty Drug," the gravamen of the plaintiff's claims of mis-billing comes down to simply determining whether or not the billings submitted conformed to the terms of the agreement, as drafted and construed by the parties, and does not implicate any

independent duty on the plaintiff's part to behave in "good faith" during any discretionary performance. Therefore, the Court will dismiss count II of the amended complaint.

B.

CompleteRX also contends that the breach of fiduciary duty claim is defective because the plaintiff has failed to allege that there was any fiduciary relationship between the parties during the course of the agreement. The plaintiff argues that the breach of fiduciary duty claim is adequately supported by its allegation that it "reposed trust, faith and confidence" in the defendant to operate the pharmacy, and because it pleaded that the agreement contained "confidentiality" provisions. The Court disagrees.

Under Michigan Law, the tort of "breach of fiduciary duty is generally defined as follows: 'Damages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed.'" *In re Duane v. Baldwin Trust*, 274 Mich. App. 387, 401, 733 N.W.2d 419, 427 (2007) (quoting *Meyer & Anna Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute*, 266 Mich. App. 39, 47, 698 N.W.2d 900 (2005)). "'A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice,'" and where "'a confidence has been betrayed by the party in the position of influence, this betrayal is actionable.'" *Alpha Capital Mgmt., Inc. v. Rentenbach*, 287 Mich. App. 589, 602, 792 N.W.2d 344, 354 (2010) (quoting *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 515, 309 N.W.2d 645, 648 (1981)).

There are some relationships that are universally recognized as giving rise to fiduciary duties: "trustee-beneficiary, guardian-ward, agent-principal, and attorney-client." *In re Estate of Karmey*, 468 Mich. 68, 75 n.2, 658 N.W.2d 796, 799 n.2 (2003). Otherwise, the existence of such

-12-

a relationship boils down to "a question of fact," *Alpha Capital Mgmt.*, 287 Mich. App. at 602, 792 N.W.2d at 354, with certain recurring scenarios coming to the fore: "(1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *Karmey*, 468 Mich. at 75 n.2, 658 N.W.2d at 799 n.2.

In this case, however, the management agreement conclusively settles the relationship question. Section 10.3 states:

> Hospital and CompleteRX are independent entities. Nothing in this Agreement should be construed to create an employer/employee, principal/agent, partnership, or other relationship other than as independent contracting entities. Neither Party has any authority to incur any obligation for or in the name of the other Party.

This provision eviscerates the plaintiff's relationship allegations in its claim for breach of fiduciary duty, and the plaintiff has never pointed to any facts or circumstances (other than its conclusory allegations that it "reposed trust, faith and confidence" in the defendant) that could suggest that the parties stood in any special relationship to each other, beyond the status they asserted for themselves in the agreement as "independent contracting entities." Therefore, the plaintiff has failed to state a cognizable claim in count III of the amended complaint.

## C.

The defendant attacks the plaintiff's fraud claim based on the general proposition that as a tort claim, it is "factually indistinguishable" from the breach of contract claim, and it is not pleaded with the required specificity according to Federal Rule of Civil Procedure 9(b). The plaintiff asserts

that its fraud claim is viable and adequately pleaded, because it has alleged numerous instances of improper billings over a span of years, which it contends "induc[ed] McLaren to accept less than it was entitled to under the contract."

Under Michigan law, "[t]o establish a *prima facie case* of fraud, a plaintiff must prove that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant knew that it was false when it was made, or made it recklessly, without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered injury because of that reliance." *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 38-39, 761 N.W.2d 151, 165 (2008) (citing *Hord v. Environmental Research Institute of Michigan*, 463 Mich. 399, 404, 617 N.W.2d 543 (2000)). "'It is generally recognized that fraud may be consummated by suppression of facts and of the truth, as well as by open false assertions . . . since a suppression of the truth may amount to a suggestion of falsehood.'" *Cassidy v. Cassidy*, No. 328004, --- Mich. App. ---, --- N.W.2d ---, 2017 WL 104978, at *16 (Jan. 10, 2017) (quoting *Hord*, 463 Mich. at 412, 617 N.W.2d at 550). However, "'[i]n order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.'" *Ibid.*

"To file a fraud claim, a plaintiff must state with 'particularity the circumstances constituting fraud.'" *Wall v. Michigan Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (quoting Fed. R. Civ. P. 9(b)). "To meet this requirement, the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." *Ibid.* (quoting *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)).

However, it is well accepted that proceedings to recover in tort for alleged defective performance under a contract are disfavored in Michigan. Michigan "common law has defined [the concept of] 'tort' [as] a civil wrong, other than a breach of contract, for which the court will provide a remedy in the form of compensatory damages." *In re Bradley Estate*, 494 Mich. 367, 384, 835 N.W.2d 545, 554 (2013). "[A] tort requires a 'wrong independent of a contract,'" and "'the distinguishing feature of a tort [is] that it consists in the violation of a right given or neglect of a duty imposed by law, and not by contract.'" *Ibid.* (quoting *Churchill v. Howe*, 186 Mich. 107, 114, 152 N.W. 989, 991 (1915)).

Here, the factual premises alleged for the "fraud" count are identical to that for the breach of contract claim, but for vacuous incantations of the elements of that cause of action, such as that the defendant "materially misrepresented" certain facts about its performance under the contract. But "Michigan law provides that 'an action in tort requires a breach of duty separate and distinct from a breach of contract.' In some cases a breach of contract may give rise to an independent tort action, but only where there is a breach of a duty that is distinct from the breach of contract." *Oak St. Funding, LLC v. Ingram*, 511 F. App'x 413, 417-18 (6th Cir. 2013) (citations omitted). Plaintiff McLaren has not pointed to any duties that arose between the parties by any other source than their contract. Where the only allegation is of a defective performance of obligations imposed by contract, the proper cause of action lies in contract, not in tort. *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 166, 809 N.W.2d 553, 558 (2011).

Although the plaintiff contends that the defendant "falsely" invoiced it for certain items as "Specialty Drugs," where they should have been billed under other (presumably more economical) provisions of the agreement, it cannot plausibly maintain that it was "misled" by those "false"

-15-

invoices, or by the defendant's tender of different versions of the "Specialty Drugs" schedule, where it asserts that the list of items that qualified as "Specialty Drugs" was stated in Section 1.5 of the agreement.  The items billed either qualified as "Specialty Drugs" by the terms of the agreement or they did not.  If Section 1.5 is unclear, the Court may have to apply ordinary principles of contract interpretation in order to elucidate fully the scope of items that were comprised by that provision.  But the plaintiff does not contend that Section 1.5 was mysterious to it; it was an express term of the agreement which the parties executed.  The plaintiff knew what it said as well as the defendant did, and it certainly cannot have relied reasonably on any erroneous interpretation or application of that section where the plaintiff presumably was equally as able as the defendant to read the contract and understand which items were meant to be billed as "Specialty Drugs" and which were not.

Indeed, that is the entire premise of the breach of contract claim — that the billing submitted by the defendant did not comply with the terms of the agreement.  The plaintiff, in fact, does not seem to have had any trouble figuring out which items were wrongly billed, where it alleges that "[e]ach invoice by CompleteRX from April 2012 to September 2012 that charged Amphotericin B or Cubicin as Specialty Drugs" was incorrect, because CompleteRX knew (per the agreement) that those item were not "Specialty Drugs."  Am. Compl. ¶ 112.  McLaren also alleges that the defendant "withheld" information by not allowing full access to its records for the purposes of the audit, but it has not alleged that it took any action in reliance on the absence of the withheld information, or that it consequently was injured in any way beyond its inability (so far) to recover amounts that it overpaid compared with what it should have been billed.

The plaintiff's fraud count pleads nothing more than that the defendant breached the contract by overcharging it.  Therefore, it will be dismissed.

D.

The defendant also argues that the conversion claim is defective because the plaintiff has not alleged that the defendant obtained any property of the hospital without the hospital's consent. The plaintiff maintains that it adequately has pleaded a claim for conversion, based on its contention that the defendant sold drugs from the hospital's inventory without paying the hospital or applying any credits against its billings for payments received from those sales. This time, the plaintiff's argument is the better one, at least in part.

"For most of Michigan's history, conversion was a tort for which the only redress was an action at common law." *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 497 Mich. 337, 353, 871 N.W.2d 136, 145 (2015). It consisted of "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Id.* at 351-52, 871 N.W.2d at 144 (quotations omitted). In *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 104 N.W.2d 360 (1960), the Michigan Supreme Court observed that common law conversion could be committed by "(a) intentionally dispossessing another of a chattel, (b) intentionally destroying or altering a chattel in the actor's possession, (c) using a chattel in the actor's possession without authority so to use it, (d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it, (e) disposing of a chattel by a sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it, (f) misdelivering a chattel, or (g) refusing to surrender a chattel on demand." (quoting 1 Restatement of Torts § 223).

-17-

In the context of that common law heritage, the Michigan legislature enacted a statutory conversion remedy in 1976. *Aroma Wines*, 497 Mich. at 353, 871 N.W.2d at 145; Mich. Comp. Laws § 600.2919a. That provision, as subsequently amended, states:

> A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
> (a)     Another person's stealing or embezzling property or converting property to the other person's own use.
> (b)     Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Mich. Comp. Laws § 600.2919a(1). The statute expressly states that the "remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise." Mich. Comp. Laws § 600.2919a(2). "Although its language is rooted in common-law conversion, the tort established in [section 600.2919a(1)(a)] is not the same as common-law conversion." *Aroma Wines*, 497 Mich. at 361, 871 N.W.2d at 149. "Rather, the separate statutory cause of action for conversion 'to the other person's own use' requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Ibid.*

The allegations that the defendant overbilled according to the terms of the agreement do not support a claim for "conversion," because such a claim for recovery of amounts overpaid in the course of a contractual performance do not comprise any mishandling of the plaintiff's property cognizable as common law or statutory "conversion." The plaintiff alleges that CompleteRX "converted the value of inventory by claiming" non-Specialty Drugs as Specialty Drugs, and "converted McLaren's monetary and other benefits." Am. Compl. ¶ 107. But it is well accepted that

-18-

Michigan law does not recognize such a basis for a conversion claim in the context of a transactional business relationship, where the same allegations form the substance of a claim that one party simply overbilled according to the terms of the agreement.  "An action for the conversion of bank account funds, i.e., the act of dominion wrongfully exerted over another's personal property inconsistent with the ownership rights of the other, can be maintained only if there was an obligation on the defendant's part to return or deliver the specific money entrusted to it." *Check Reporting Servs., Inc. v. Michigan Nat. Bank-Lansing*, 191 Mich. App. 614, 626, 478 N.W.2d 893, 900 (1991).  Here, the plaintiff does not allege that the defendant was entrusted to manage specific funds, only that it submitted improper billings, which it asserted were proper under the contract, but which were not.  As one district court explained:

> Here, the facts do not support the claim of conversion with regards to either the breach of contract or the transfer of funds and assets.  Plaintiff did not entrust specific moneys to the care of Defendant; instead, Plaintiff and Defendant engaged in the sale and purchase of goods according to an express contract.  Because Plaintiff's cause of action arises from the breach of the contract (and not the appropriation of specific funds in violation of a separate legal duty), Plaintiff's conversion claim fails.

*Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 815-16 (E.D. Mich. 2008); *see also Llewellyn-Jones v. Metro Property Group, LLC*, 22 F. Supp. 3d 760, 788-89 (E.D. Mich. 2014) (dismissing fraud count because "[t]he plaintiffs [did] not identif[y] such a separate duty.  They allege[d] only that, in an effort to conceal the fraudulent scheme, the defendants charged the plaintiffs for repairs that were never made and court fees and eviction costs even though no one lived at the properties.  That states no more than that the defendants did not live up to their property management obligations.").

Nevertheless, the plaintiff also alleges that the defendant "converted to its own use McLaren's inventory of drugs, medical devices, and Specialty Drugs; transferred part of McLaren's inventory to another hospital or medical provider; [and] instructed the other hospital or medical provider to pay CompleteRX directly instead of paying McLaren upon receipt of [the hospital's property]." Am. Compl. ¶ 107. The plaintiff further asserts that, having sold off part of the inventory, the defendant never informed the hospital of the sale or accounted for any of the proceeds in the course of billing for the pharmacy operation. Those allegations stand on a distinctly different footing from the simple contention that the defendant billed incorrectly or excessively for its services.

It fairly can be inferred from the allegations that the defendant took possession of at least some inventory previously held by the hospital, and that the parties expected that inventory to be used to fill prescriptions for the hospital's patients. The plaintiff alleges that, instead of using the existing inventory for that purpose, the defendant sold off some part of it to other medical facilities, pocketed the sales proceeds, never reported the sales to the defendant, and never credited any amounts against its ongoing billings for the ill-gotten gains. Those facts, if proved, are sufficient to establish that the defendant converted some portion of the plaintiff's property for its own benefit. And that accusation — that one party sold off the property of another without permission and kept the proceeds for itself — establishes a viable conversion claim notwithstanding that there also was a contract between the parties that generally contemplated the ongoing purchase and distribution of such property by the defendant. *Aroma Wines*, 497 Mich. at 351-52, 871 N.W.2d at 145 (observing that common-law conversion in Michigan may include, among other things "using a chattel in the actor's possession without authority so to use it" and "disposing of a chattel by a sale, lease, pledge,

-20-

gift or other transaction intending to transfer a proprietary interest in it") (citing *Thoma*, 360 Mich. 434, 104 N.W.2d 360)).

III.

The defendant has not challenged the breach of contract count.  The plaintiff has not pleaded viable claims for breach of an implied covenant of good faith, breach of fiduciary duty, or fraud. The allegations that the defendant sold drugs from the plaintiff's inventory to other medical providers and kept the proceeds will sustain the conversion count.

Accordingly, it is **ORDERED** that the motion for partial dismissal [dkt. #14] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts II (breach of an implied covenant of good faith), III (breach of fiduciary duty), and V (fraud) of the amended complaint are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the defendant's original motion for partial dismissal [dkt. #8] is **DISMISSED as moot.**

s/David M. Lawson                     <br>DAVID M. LAWSON<br>United States District Judge

Dated:   July 18, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 18, 2017.

s/Susan Pinkowski     <br>SUSAN PINKOWSKI
